**SIENI EUTA, Plaintiff**

**v.**

**RINI ETIMANI, CONTINENTAL TRANSPORT SERVICES,
and INSURANCE COMPANY OF THE PACIFIC, Defendants**

High Court of American Samoa
Trial Division

CA No. 134-91

September 3, 1993

Before RICHMOND, Associate Justice, VAIVAO, Associate Judge, and LOGOAI, Associate Judge.

Counsel: For Plaintiff, Robert A. Dennison III
For Defendants Rini Etimani and
Continental Transport Services, Afoa L. Su'esu'e Lutu
For Defendant Insurance Company of the Pacific,
Roy J.D. Hall, Jr.

This action for damages for personal injuries arising out of a motor vehicle accident was tried on June 29, 1993.

FINDINGS OF FACT

This three-vehicle accident occurred about noon on June 29, 1990, on the public highway in front of the Methodist church in Lauli'i, American Samoa.

Plaintiff Sieni Euta ("Sieni") was a passenger, riding in the right front seat of one of the vehicles, a Suzuki jeep. The driver of this vehicle was Ipipaea Taliva'a ("Ipipaea"). A Ford commercial, family or aiga bus, owned by defendant Continental Travel Services ("CTS"), was also involved. Defendant Rini Etimani ("Rini") operated this vehicle

while employed by CTS. Defendant Insurance Company of the Pacific ("ICP") provided the liability insurance coverage for this vehicle. The third vehicle, a taxi, was a Toyota sedan.

Sieni, her husband, and one minor child live in Lauli'i with Ipipaea's family. At the time of the accident, Ipipaea was taking Sieni to the American Samoa Government's medical center at Faga'alu to take care of an itching hand. The rear seat of the jeep was occupied by Peti Tuia and two minors, Jerry Leung Wai, Jr. and Wayne Leung Wai.

They left home, which was inland of the public highway. When they reached the intersection with the highway, the CTS bus was stopped to the right of the jeep, unloading and loading passengers along the westbound side of the highway. The jeep turned right onto the westbound lane of the highway and passed the bus. The bus then followed the jeep.

Heading westward from this intersection, the road in this area makes an extended right-hand curve, somewhat sharp and blind at one point. Then it curves left into a short straight section before it reaches the Methodist church. At that point, a relatively steep uphill incline begins. At the time, the road was dry, and the weather was clear.

As the two vehicles approached the Methodist church, located on their right-hand side and north of the highway, the bus was in the eastbound lane attempting to pass the adjacent jeep in the westbound lane. The taxi was in the eastbound lane in the immediate vicinity of the church.

When Rini became aware of the situation, he tried to return the bus to the westbound lane. He also instinctively braked the bus. Some testimony indicated that the taxi driver was about to turn the taxi left towards the church, but he probably intuitively slowed down and otherwise reacted to try to avoid the impending impact. However, the bus, jeep and taxi collided almost instantly. The bus and truck essentially hit head-on. Whether the bus also struck the jeep, as Sieni and Ipipaea claimed but Rini disclaimed, the jeep swerved out of control to the left and slammed into the taxi. In colloquial terms, the taxi and the jeep were "totalled."

Significant differences exist in the testimony on events during the interval from the jeep's entry onto the main road until the point of impact of the three vehicles, approximately one-quarter mile in distance.

Sieni was aware that the bus was behind the jeep. She testified that Rini sought to bring the bus past the jeep three times, the last ending in the accident. Ipipaea did not slow the jeep to give way to the bus at any time, and Sieni did not tell Ipipaea to slow down the jeep. Ipipaea testified that she noted the bus about one car-length behind the jeep in her rear-view and side-view mirrors, but she was only once aware that the Rini was seeking to overtake the jeep--the last attempt beginning near the Roman Catholic church, about 600 feet east of the Methodist church. She and Sieni were conversing, which she thought might possibly have diverted her attention from other passing attempts by Rini.

Rini testified that at first the jeep was moving slowly ahead of the bus. He cautiously tried to overtake the jeep three times, but each time Ipipaea first increased and then decreased the jeep's speed. During the last attempt to pass, he saw the taxi ahead of the bus, but when the jeep slowed, he thought he had room to return to the westbound lane. However, Ipipaea again accelerated the jeep, and Rini could not return to the westbound lane before the bus struck the taxi.

Rini was convicted by his plea of guilty to careless driving, a misdemeanor, in connection with the accident. However, recognizing that convenient disposition rather than guilt frequently motivates guilty pleas to traffic citations, we do not assign major significance to this conviction. This decision certainly does not turn on that fact.

Rather, we are persuaded that under either version of the sequence of events, Rini's conduct was negligent and proximately caused Sieni's injuries. Under Ipipaea's account of these events, Rini used poor judgment when he attempted to pass the jeep less than one-eighth of a mile before the relatively steep uphill incline begins and where the three vehicles collided. The visible presence of the taxi, either at or shortly after the time he started overtaking the jeep, further confirms his subnormal decision.

If, on the other hand, Rini's recitation of these events is accurate, and Sieni's testimony endorsed at least the multiple passing attempts in this version, Rini's judgment was even more inferior. Under this scenario, Ipipaea engaged in a "cat and mouse" game with the bus, and Rini's continuing attempts at overtaking were, at best, imprudent. Starting the third passing effort was a serious error on his part. His failure to back off from passing when the taxi appeared or Ipipaea accelerated the jeep was inexcusable.

Whichever way events truly unfolded, and we are inclined to believe that Rini's account is closer to fact, his operation of the bus at the moment of and immediately before the accident was not the conduct of a person of ordinary prudence in the same situation and possessing the same information. Under either set of circumstances, a reasonably prudent person would have foreseen or anticipated that someone might be injured as a result of driving a bus in Rini's manner. Rini was negligent, without which Sieni would not have been injured.

At the time of the accident, Rini was clearly performing the duties for which he was employed by CTS and was acting within the scope of his employment.

While riding in the jeep, Sieni was conversing to some extent with Ipipaea, but she acknowledged awareness of Rini's several, unsuccessful attempts to overtake the jeep. A reasonably prudent person would have told Ipipaea to slow down or take some other precaution. Sieni's failure to speak up contributed at least slightly to her injuries, for which we attribute a proportionate 5% reduction in her recoverable damages.

Sieni's right hand was severely injured. An extensive and dirty, third-degree avulsion, or tearing away of tissue, occurred on the dorsum, or back, of the hand. This degree of avulsion is the most serious, exposing in this instance metacarpi, or the bones of the hand to which the bones of the fingers are attached.

At about 5:00 p.m. on June 29, 1990, in the operating room at the government medical facility, the wound was cleansed, and dead or devitalized tissue was debrided or removed by Dr. Vaiula Tuato'o, chief of surgery. Sieni remained an inpatient and was regularly given medications to reduce pain and the risk of infection, until her discharge on July 1, 1990. She was advised but declined to undergo skin-grafting procedures as soon as possible and to have whirlpool treatments and regular dressing changes to resist infection.

Sieni missed visits, and infection developed. On July 6, 1990, she was readmitted due to the infection and to further consider skin grafting, which she ultimately refused. She was last seen by Dr. Tuato'o on September 28, 1990. At that time, contracture restricting hand flexion and extension was pronounced, but only a small area was still raw. In the doctor's opinion, her right arm was 50% disabled from the impairments in her hand and wrist joints, excluding disfigurement from

142

the deformed hand and permanent scar. Based on her inability to hold objects, he considered her right hand to be useless. She did not make her doctor's appointment for a final examination three months later.

In the courtroom, Dr. Tuato'o observed that Sieni had regained some wrist movement and ability to hold things. He opined that her present hand disability was in the 70% to 80% range and that her arm disability was about 40%. However, if the skin grafting had been done immediately, as he had recommended, the present disabilities would probably be 20% to 30% better than they are today.

Skin grafting is still possible today and would improve the appearance of Sieni's hand significantly. Orthopedic surgery is also still an option, but the probability of success would first require special examination and assessment. These operations can be done locally at no cost, except for inpatient charges. However, Dr. Tuato'o recommended that these procedures, if now undertaken, be done off-island. In this event, surgical expenses would be approximately $50,000, excluding costs associated with a proper recovery and rehabilitation program after each of the surgeries were completed. We also sense, resorting to a slang expression, that the doctor's "nose was bent out of shape" somewhat by Sieni's rebuff of his surgical expertise.

Unquestionably, Sieni experienced acute immediate pain from her injury. This fact was vividly substantiated by her and Ipipaea's testimony. In some mitigation, Dr. Tuato'o explained that while a third-degree avulsion is the most severe, it tends to be less painful than first-degree and second-degree avulsions, which expose nerves and bleed profusely. Certainly, physical pain has persisted, and Sieni has endured considerable suffering over her substantial disability and disfigurement. General damages are assessed at $40,000.

The evidence affirmatively authenticated only four days of hospital inpatient care. Given Sieni's staunch rejection of skin grafting and lack of firm total-cost estimates, we are not disposed to award damages for future and, at best, conjectural surgical procedures. Resident inpatient care at the government medical facility is $7.50 per day. Thus, special damages for medical expenses are $30.

Sieni was employed by StarKist Samoa, Inc. when the accident occurred. Her hourly wage was $2.92. She customarily worked 7.5 hours per day, five days per week. As a result of the accident, she did not work from June 29, 1990, until October 17, 1990. It was not until

Dr. Tuato'o's examination on September 28, 1990, that she was advised that she could return to work with light duties for the next six months. Based on her usual work-week and taking into account one week of company down-time in July 1990, she missed 547.5 hours of work. At $2.92 per hour, her special damages for lost wages are $1,598.70.

## CONCLUSIONS OF LAW

1. Rini and CTS, his employer, are jointly and severally liable for Sieni's damages for personal injuries. *See Saufo'i v. American Samoa Gov't*, 14 A.S.R.2d 15, 19, 22 (Trial Div. 1990); *Kim v. Star-Kist Samoa, Inc.*, 7 A.S.R.2d 12, 15 (Trial Div. 1988), *aff'd in part and rev'd in part on other grounds*, 8 A.S.R.2d 146 (App. Div. 1988). The comparative-negligence statute, A.S.C.A. § 43.5101, does not alter the common-law rule of joint and several liability in this type of case. *See generally* 57B Am. Jur. 2d, *Negligence* § 1243, at 147-48 (1989 & Supp. 1993). This statute cannot be reasonably construed to require apportionment of negligent conduct by a defendant and a non-party so as to reduce a defendant's liability. *See generally* 57B Am. Jur. 2d, *Negligence* § 1239, at 143-44; *see, e.g., Peterson v. Pittman*, 391 N.W.2d 235, 238 (Iowa 1986); *Blocker v. Wynn*, 425 So. 2d 166, 168 (Fla. App. 1983).

2. ICP, as CTS' insurer, is directly liable for $10,000 of Sieni's damages for personal injuries. A.S.C.A. §§ 22.2003(3)(A), 22.2018.

3. Sieni's general damages for pain and suffering, including disfigurement, are $40,000, and special damages for medical expenses and lost wages are $1,628.70. Thus, her total damages are $41,628.70.

4. In accordance with A.S.C.A. § 43.5101, Sieni's damages are reduced by 5%. Thus, she is entitled to receive and is awarded $39,547.27 in damages.

Judgment shall enter accordingly. It is so ordered.

(As corrected per order of October 3, 1993)